There are three reasons why Mr. Bloom's placement at the Community Correction Center should not be considered custody but rather part of supervised release. Those three reasons are, first, the language of 18 U.S.C. 3624, second, it's the Supreme Court and Ninth Circuit case law which supports the reading that his placement at the CCC is part of supervised release and not custody, and third are the facts of this case. 18 U.S.C. 3624C contemplates the BOP releasing a prisoner with giving them 10 percent before the end of the sentence releasing them under conditions which help the prisoner adjust and prepare for life in the community. Further, it continues that this is to be done with the help of the United States Probation Office. 3624E further tells us that supervised release and release to the person's probation officer begins on the day the person is released from custody, I'm sorry, from imprisonment. With that reading, we turn to the case law which tells us that United States v. Johnson 529 U.S.F. 3rd Act 59 tells us that supervised release helps a prisoner transition to the community. And so we have here that CCC placement is not, not only not synonymous or equivalent to imprisonment, it's not custody, and continuing United States v. Baxley of the Ninth Circuit, 982F 2nd 1265, a Ninth Circuit case from 1992. In that case, the prisoner was, sorry, the person was released pretrial to a CCC, he left the CCC, and the Ninth Circuit panel in that case decided that that was not custody either. And so... Is there no distinction between pretrial and posttrial? And by the way, do you know who pays for these beds at the CCC pretrial and who pays for them after somebody's been released from incarceration? Don't you suppose the Bureau of Prisons is paying for that bed? I can't suppose either way. All I know is that the 3624 tells us that the person is released, and we understand that they're to be released to the probation officer. And 3624C... It would seem to follow, then, the probation officer's probably paying for the bed, then, if he's really not in custody, huh? Well, for the purposes of 751 escape, United States v. Baxley, Ninth Circuit case, specifically dealt with the escape provision. And even if the probation department or the Bureau of Prisons were to pay for the bed, certainly in that case, they found that it wasn't custody for the purposes of escape under 751. Well, this escape is escape from the custody of the Attorney General? That's what the government alleges. Well, what is it? Well, I think it's, at best, a supervised release violation. What I'm proposing is not some way for prisoners or people released from prison to simply escape any punishment. The statute, am I incorrect in saying that, in quoting the Section 4082, is saying that the willful failure of a prisoner to return within the time prescribed to an institution or facility designated by the Attorney General shall be deemed an escape from the custody of the Attorney General? You're correct. That's certainly what the statute reads. Is this an institution or facility designated by the Attorney General that he didn't go back to? I don't believe it is. Why not? Here we have the Bureau of Prisons. Who picked it? The Bureau of Prisons? The Bureau of Prisons picked it. They released Mr. Bloom from FCI Phoenix under no supervision, under no escort at all. He took a taxi with his own money and came to San Diego. When he was in the Federal Correctional Institution in Phoenix, he was in the custody of the Attorney General, was he not? That's true. The Attorney General of the Bureau of Prisons. Okay. And then the Bureau of Prisons, okay. Then the Bureau of Prisons picks, the Attorney General says, now you're going to go to this facility. Is that correct? That's true. Okay. And that's under certain conditions, isn't that correct? Meaning his stay at the facility? Yeah, he's supposed to come back. If he goes out to work or whatever, he's supposed to come back. That's true. And he didn't. That's true. And so he there, and in your view, still he didn't escape from the custody of the Attorney General that includes failing to return within the time prescribed to an institution or facility designated by the Attorney General. Correct. That's my position. Yeah. Because once placed at a CCC, the case law and the interpretation of what is supervised release and what is incarceration tells us that placement at CCC, a place where, like Mr. Bloom, he's allowed to go and get a job and a hygiene pass in this case, these, the terms of his, generally speaking, confinement are not as restrictive as being placed in a prison. And so 3624C, the way it's described, it says under the, to the extent that the, well, sorry, it describes the United States probation system being involved in this placement. And so if 3624 contemplates the United States Probation Office being involved, then this is no longer a Bureau of Prisons custody issue. Is it your position that it was the Probation Office that sent him to this CCC? Are they the ones that said, okay, here's where you go? No. No. The Bureau of Prisons said that. That's correct. That's correct. But the way, the only way this, the reading of this statute makes sense, given the case law that interprets what supervised release is, what the Supreme Court case law interprets what supervised release is, and what imprisonment is and what custody is, is to read it in a manner which contemplates what the reality of the situation is, which is that he's not confined as he is in, as he is when he's incarcerated, but rather he's free to go get a job however he does have to come back. So he doesn't go back and he isn't found for three months. And your position is that he did not escape from custody. He just violated the terms of his supervised release. That's how. What happens to him then? Then he's, well, it's a supervised release violation, and the district court has jurisdiction to punish him however it sees fit. The what? Go ahead, sir. Did the court revoke his supervised release? No. Because the U.S. attorney brought an escape charge rather than a supervised release violation. Looking at excerpt of. To be treated just the same way as if he had checked in a half an hour late because he had an accident on the way back to the facility. Well, yes. I mean, generally speaking. I mean, there are more egregious violations of supervised release, but or not returning to the CCC or however the case may be. I'd like the court to consider one case at least that I hadn't cited in here, but the point of law is still present in my briefs, and that's U.S. versus Behe, B-H-E-2-0-1-F-3-11-24, which tells us that community confinement is not imprisonment and distinguishes how these two concepts are different. Well, community confinement isn't imprisonment, but the question is whether it's a custody of the attorney general. I mean, surely you're not saying that the only thing that the Bureau of Prisons or the attorney general can do is to lock somebody in a cell somewhere in order to constitute custody. Isn't there enough flexibility to allow things like work release? There is. The 3624 specifies what the Bureau of Prisons can do and what it can't do. In this case, to the extent it allows the Bureau of Prisons to release someone early, 3624, and the reading of 3624C and E shows that what's contemplated is that this is supposed to be done. This release is to be done, and the language of the statute is clear, is to be done under the United States Department of Probation. And if so, if the United States Probation Department is contemplated to be involved in this process, then it makes sense that once he's released from imprisonment, supervised release begins. And the case law that I cited in my brief specifies that that's supposed to be taken literally. The day someone is released from imprisonment is when supervised release begins. Supervised release and imprisonment cannot be at the same time. And so the reading of the statute and the way appellate contemplates,  Thank you. Thank you. Thank you. Steve Miller for the United States. The essential foundation of the appellant's argument here is that any change in the level of confinement is tantamount to a release. And if you, which is just not true, 3624 directs the Bureau of Prisons on what it must do. I don't think that's true. I think if you're in a maximum security institution and you're sent to a different institution. Oh, yes. Correct. It's a different level of confinement. I don't think he's arguing that you're still not in prison. Right. But essentially in this case is that the Bureau of Prisons is directing He's saying once those doors open. Yeah. What he's saying is once you change the level of confinement, if you're in a penal institution in Phoenix and then sent to a community correction center, then that's tantamount to a release. Now in this case, we know that he, that event occurred before the expiration of his original 24 month sentence. And the Bureau of Prisons under 3624 has a number of directives. A, you shall keep the prisoner until his sentence is done. B, you will give him credits toward that and take them away if there's a disciplinary problem. C, you will at the last 10% of his sentence, give him the opportunity to go into a program that will help him reintegrate into society. D, which is not referenced in the briefs, that is when you transfer him to that lower level of confinement, you'll give him clothes, money, and adequate transportation to there. And then E, which is the supervision after release. After the completion of this term of imprisonment, then it will be transferred to the probation department for supervised release. Now the order that this court issued for supplemental, not supplemental briefing, but supplement of the excerpt of records raised the question as to whether or not, this court had questions, whether the defendant had actually completed his term at the end of, when he was transferred from Phoenix to San Diego. And I set out a flow chart for the court's convenience, if you wish. All right, give it to the clerk. This is not part of the record, I take it? No, this is part of my argument. And this shows why when he stepped out of the doors in Phoenix, he was still serving his alien smuggling term of imprisonment. Because it had not yet expired. On June 2nd, he was sentenced. That was 24 months. That equals 730 days total. From the pre-sentence report that was provided in the supplemental excerpt of records, there were 125 days of pre-sentence custody. That's on the face page of the pre-sentence report. If you subtract the total number of days from 24 months and the pre-sentence custody, that's 605 days. Fifty-four days is the first period of vested credits. That's for the first 12 months. Those were vested. The Bureau of Prisons cannot take that away. You subtract that, that's 551 days. So if you subtract the pre-sentence custody and the vested credits, 551. Upon his disciplinary hearing to revoke his custody credits, the record shows that he had 40 days of unvested credits because he had not yet served the second anniversary. And that was prorated for the remaining 146 days. And if you subtract those 40 days of unvested credits, that's 511 days. 511 days is the days remaining on the sentence minus pre-sentence custody credit, vested credits, and unvested credits. 511 days is the magic number in this case because that is the days that were remaining on his sentence on June 2nd. His projected release date was October 26th, 2004. And that equals the exact number of days between June 2nd, 2003 and October 26th, 2004. When he was transferred from Phoenix to San Diego, that was August 25th. So he had yet to complete the 511 days remaining on his sentence. So under no circumstances could he have been serving his term of supervised release because he had yet to finish the complete term of 24 months custody minus vested and prorated custody credits. There's just no way. And it would be internally inconsistent to direct the Bureau of Prisons, you shall keep him for the balance of 511 days after we remand him to your custody and not give him the chance to go back to the CCC to reintegrate into society. If you have any questions, I have nothing further. Well, what was the practical effect of the disciplinary hearing? Were days of good time taken away from him? Yes. And what was the authority for taking those days? That would have been 3624B. That's the portion that directs the Bureau of Prisons to grant people up to 54 days credit each year. And also authorize revocable for violations of disciplinary rules. For anything. They're not really vested days. They're contingent days. Yes. The way it is, each year you're entitled to 54 days, but upon the chronological anniversary of 12 months, those 54 days vest, and the Bureau of Prisons cannot take those away for any disciplinary purpose. You can violate all kinds of disciplinary rules and still keep those 54 days. Correct. But the incentive for the prisoner not to violate all the other rules is because he still has, in the second chronological year of a sentence, the ability to accumulate 54 more days, and the Bureau of Prisons can use that as the incentive to keep discipline within the prison. And in this case, the basis of the revocation was Code 200, which was the Bureau of Prisons' disciplinary margin or index for escape. Some of the states have an offense called absconding from supervision. I don't know if that's a federal offense or not, but that creates a loss of good time in states that have that. If you abscond from supervision while actually on supervised release, theoretically he wasn't really on supervised release. He was transferred to a different type of custody. Correct. He was still serving his sentence in the custody of the attorney general. But when he absconded from that different type of custody, he was indicted then for escape. Right. Because the equivalent of absconding from release or supervision on the state, the equivalent of that is the 4080, I would say, that tells the prisoner shall stay within the limits of the confinement. That's the equivalent. And I'm not quite sure what the – at least for the California state, the custody credits are very confusing because you have half times for a local custody, third time for a prison custody, and then if you're a second or third striker they have the same 15% structure, 15% possible reduction structure as the federal government. So in answer to your question that the failure to remain within the limits of your confinement would be the equivalent of that State obstruction or abscond. Does that answer your question? All right. Thank you. Thank you. You have used your time. If you feel compelled to add something, we'll give you a minute. Thank you. The chart that Mr. Miller provided is not completely accurate because the 4080 upon which that's prorated, that's based on his good time credit. This October 25 – this October 26 date, that's the anticipated release date. ER 15 makes that clear. The reason Mr. Bloom was released in August 25, 2004, it's based on his good time satisfactory credit and under the authority of 3624C and 3621A, which says that the prisoner is released at the end of his term of imprisonment or earlier based on his good time credit. And so here we have the prisoner released based on his good time credit, and this release is the start of his supervised release term as contemplated in 3624 as the case law makes clear that this type of transition to the community is for rehabilitative purposes and not for the purposes, not impunitive purpose as United States v. Bahi makes clear. Thank you. Thank you. The case just argued is submitted for decision. We'll hear the next case, which is United States v. Oza.
judges: Schroeder, Goodwin, Sedwick